IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRIAN JOSEPH STOLTIE,

       Plaintiff,             No. 2:07-cv-1479 MCE JFM PC

     v.

DR. ANA SOARES, et al.,

       Defendants.          FINDINGS & RECOMMENDATIONS

_____/

       Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.

       Plaintiff claims defendant Dr. Soares, a staff psychiatrist, ordered emergency involuntary psychotropic medications against plaintiff's will and denied plaintiff's offer to take oral medication "against his will." (Complt. at 5.) Plaintiff alleges defendants Bennett, Terry, Holloway and Rayfield, medical technical assistants, "slammed" plaintiff to the ground, and that defendant Gooselaw administered the emergency medication by injection without plaintiff's consent. (Id.) Plaintiff argues these acts violated his civil rights 42 U.S.C. § 1983. (Id.) Plaintiff also seeks damages under state tort law. (Id.) This matter is before the court on defendants' motion for summary judgment.

1

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

/////

On August 29, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

ANALYSIS

I. Facts[1]

1. Plaintiff is a state prisoner presently housed at California Medical Facility in the California Department of Mental Health's Vacaville Psychiatric Program (VPP).

2. Plaintiff was convicted of assault with a weapon with intent to inflict great bodily injury.

3. Plaintiff has been admitted on numerous occasions between November 2006 and March 2008 to the VPP for treatment resulting from his serious mental illness, mental disorders and suicidal behavior of cutting himself with whatever instrument he can find (i.e. razor, staple), and exhibiting range and anger.

4. Plaintiff has been diagnosed with Bipolar I Disorder, Borderline Personality Disorder, with poor impulse control, low frustration tolerance level, anxiety, and racing thoughts. He has and can be easily agitated, aggressive, easily angered, with emotion lability (mood swings) with disproportionate and unpredictable anger/rage.

5. Defendants contend plaintiff has banged on cell walls and doors when frustrated at not getting his way. (Defts.' Ex. A, Medical Record - 11/20/06 - 11/27/06 at 18; Lipon Decl. at ¶ 8.) Plaintiff denies these facts are true, but failed to provide any evidence to the contrary.

6. Defendants contend Ana J. Soares, M.D., was employed by the California Department of Mental Health as a licensed staff psychiatrist for over 8 years working at the VPP

---

[1] Unless otherwise noted, these facts are undisputed.

4

at California Medical Facility and over 3 years at VPP's Q-3 Unit. Dr. Soares is a trained and experienced ABPN Board certified psychiatrist, who has taught psychiatry at UC Davis Medical Center where she did her post-graduate training. (Soares' Decl. at ¶¶ 1-7 & Ex. 1; Lipon Decl. at ¶ 6.) Plaintiff denies these facts to be true, but provided no evidence to the contrary.

7. On January 9, 2007, plaintiff was initially assessed and admitted to the VPP's Q-3 Unit by Dr. Soares after serious suicidal/self-injurious behavior on December 20, 2006, where he intentionally cut his arm and suffered significant blood loss requiring several stitches.

8. Dr. Soares reviewed plaintiff's medical history, which reflected suicidal/self-injurious behavior (mostly cutting himself since he was a teenager). For example, on October 9, 2006, plaintiff cut his right arm at the anteculilar vein with a razor blade with significant blood loss requiring a blood transfusion, stating he wanted to die. Plaintiff had a second self-injurious cut on October 25, 2006, where he cut himself on the same right arm in the same vein where he had previously cut with a razor blade.

9. Plaintiff has a family history of suicide with his grandfather committing suicide.

10. Dr. Soares and the Treatment Team assessed plaintiff as a high suicide risk and a high assault risk based on his serious mental illness and mental disorders, his medical history of disproportionate rage/anger, his suicidal/self-injurious behavior of cutting himself and criminal offense record of violence.

11. Dr. Soares was plaintiff's treating psychiatrist and leader of his Treatment Team between January 9, 2007 through March, 2007, until plaintiff was stabilized and transferred to the VPP's P-2 Unit on April 2, 2007, under Dr. Brim's care.

12. At the initial interview, plaintiff told Dr. Soares he would cooperate and agreed to voluntary psychotropic oral medications, including Seroquel, an anti-psychotic medication, to control and treat mental illness and disorders, his suicidal/self-injurious behaviors and his rage/anger issues, and signed informed consent agreements as part of his Treatment Plan.

5

13. Plaintiff also agreed to a voluntary oral medications plan to control and treat his mental illness and disorders, which included Seroquel, an anti-psychotic he specifically requested, after refusing it initially.

14. At about 5:30 p.m. on February 13, 2007, plaintiff engaged in serious self-injurious behavior by intentionally cutting his right arm and vein area with a staple, causing a one cm. wound with significant bleeding which required medical attention at VPP's B-Emergency Clinic and two stitches. Blood from his self-inflicted cut had seeped out from under his cell door, which an MTA noticed and then took plaintiff out of his cell for emergency medical treatment.

15. Defendants contend the attending psychiatrist put plaintiff on one-on-one suicide watch based on his February 13, 2007 self-injurious cutting behavior, and on February 14, 2007, a mini-Treatment Team went to plaintiff's cell to assess his suicide risk, treatment and medication needs to prevent further suicidal/self-injurious episodes. (Lopez Decl. at ¶ 5; Bunngay Decl. at ¶ 8c; Soares' Decl. at ¶¶ 15, 16e, 17; Ex. A - Medical Files - Phys. Progress Notes (at 74); IDN (at 138).)

Plaintiff denies these facts to be true, yet failed to provide any evidence to support his denials. Moreover, the physician's orders provided by plaintiff confirm that plaintiff was placed on a 1:1 suicide watch. (Pl.'s May 4, 2009 Stmt. Disputed Facts ("Stmt."), Ex. 1.)

15a. The attending psychiatrist ordered plaintiff to take 400 mg of Seroquel along with 100 mg of Benadryl. (Pl.'s Stmt. at 1, Ex. 1.) Plaintiff contends he took those medications by mouth. Id.

16. Defendants contend that on February 14, 2007, plaintiff twice refused to take his two scheduled morning oral medications, including Seroquel, his anti-psychotic medication at 0020 (12 a.m.) and at 0800 (8 a.m.). (Bunngay Decl. ¶ 8g; Ex. B - Medication & Treatment Chart (p. 29); Soares' Decl. ¶ 13; Lopez Decl. ¶ 5; Ex. B - Medication & Treatment Chart (at 29), Ex. E - Pl.'s Depo., 15:9-17:4.) Plaintiff denies these facts to be true, but in his declaration states

that "[o]n the morning of February 14, 2007, I exercised my right to refuse my a.m. dose of medication and to participate in treatment." (Pl.'s Decl. at 2.)

17. On February 14, 2007, Dr. Soares and the Treatment Team went to plaintiff's cell, but he refused to talk to Dr. Soares, Dr. Armstrong, or anyone else on the Treatment Team despite their attempts to engage him and to encourage him to cooperate and meet with the Team. As a result, the Team and Dr. Soares were unable to properly assess plaintiff's suicide risk and treatment/medication needs to prevent another suicidal/self-injurious episode by plaintiff. (Soares' Decl. ¶¶ 15, 16d, 163; Lopez Decl. ¶ 6; Bunngay Decl. ¶¶ 8d, 8e. Ex. E - Pl.'s Depo. - 17:5-18:6; 23:22-25:7; 25:22-27:19.)

Plaintiff denies these facts to be true. Plaintiff counters that while he did state that he would resist and fight forced drugging, he was not displaying or threatening harm to himself or others at this time. (Pl.'s Stmt. at 2.) Plaintiff informed the Treatment Team the morning of February 14, 2007 that he had "nothing to say." (Id., Ex. 3 - Special Incident Report at 7.)

18. On February 14, 2007, after discussion with the Treatment Team, Dr. Soares and the Team determined there was an emergency and plaintiff had become a danger to himself based on the following factors:[2] (Soares Decl. ¶ 16; Lipon Decl. ¶ 6; Lopez Decl. ¶ 5; Bunngay Decl. ¶¶ 8d, 8e.

a. Plaintiff had intentionally cut himself on his right arm causing significant blood loss the night before (on February 13, 2007).

b. The next morning, on February 14, 2007, plaintiff refused to take his two scheduled morning oral medications, including Seroquel, his anti-psychotic medication at 0020 (12 a.m.) and at 0800 (8 a.m.)

/////

---

[2] Plaintiff states he will "admit in part and deny in part, as undisputed fact number 18 is narrative." Id. Plaintiff provides no further explanation and fails to identify the facts he admits.

c. Plaintiff refused to talk to or respond to any questions from Dr. Soares or Dr. Armstrong, and refused to cooperate or meet with the Treatment Team.

d. Without his cooperation, the Team and Dr. Soares could not evaluate plaintiff's suicide and safety risks or treatment or medication needs to prevent another episode of suicidal/self-injurious behavior.

e. Plaintiff's oppositional and uncooperative behavior of refusing his two scheduled morning oral medications and his refusal to meet with the Team about his mental condition or treatment needs on February 14, 2007, and his suicidal/self-injurious behavior on February 13, 2007, demonstrated that he was not capable of making any judgments or giving informed consent about his treatment needs.

f. Until February 13, 2007, plaintiff had not engaged in any intentional cutting of himself since he was admitted on January 1, 2007. Plaintiff had been cooperative with his Treatment Team and assessed as doing fairly well on February 6, 2007. Plaintiff's behavior on February 13 and February 14, 2007 evidenced a sudden change from his previous behaviors and mental state.

Plaintiff counters that he maintained a right to have the emergency medications administered in the least restrictive manner, orally.

19. Based on the emergency circumstances of February 14, 2007, Dr. Soares and the Treatment Team determined that administering emergency involuntary medication by I/M (intramuscular) injection for no more than 72 hours was medically necessary and appropriate to prevent and protect plaintiff from engaging in another more serious incident of cutting until the medication took effect.

20. Plaintiff's circumstances -- a diagnosis of serious mental illness and severe mental disorders, his high suicide risk based on his family history of suicide, and his past history of suicidal cutting (such as mutilation by razor blade with intent to die) -- can be fatal if left untreated.

21. Defendants contend that once it was determined that a medical emergency existed, the Treatment Team and Dr. Soares exercised their professional judgment that administering the emergency medication by injection was the least restrictive method, particularly since plaintiff had already refused his oral medications twice and had been noncompliant with his voluntary oral medications for the previous 8 days. (Defts.' Ex. B at 29.) The emergency medication by injection is faster acting than oral medication, and it would ensure the medication was actually taken, and in plaintiff's system in order to prevent and protect plaintiff from serious imminent harm.

Plaintiff concedes that the Treatment Team made a determination that an emergency existed. (Pl.'s Stmt. at 2.) Plaintiff denies the remaining facts in 21 are true, but fails to provide any evidence to the contrary.

21a. Dr. Soares and the Treatment Team are aware of the practice of "cheeking," or pretending to take medications, and that it is a common practice by inmate/patients to avoid medication compliance. Plaintiff argues that because Haldol and Benadryl come in liquid form, defendants' concern about "cheeking" was unwarranted. (Pl.'s Stmt. at 2.) Moreover, plaintiff contends he has no history of "cheeking" medication.

22. It was not possible to obtain plaintiff's consent to take the emergency medication by injection. Efforts by Dr. Soares, Team members, and Sr. MTA Bennett to explain why emergency medication by injection was needed and to gain plaintiff's cooperation were unsuccessful. Plaintiff's escalating agitation, aggressiveness and anger at Dr. Soares for not allowing him to take the emergency medication orally, refusal to take his morning medications, and his prior eight days of noncompliance with his agreed oral medications demonstrated his impaired judgment and mental condition. (Soares' Decl. ¶¶ 18, 19, 20; Lopez Decl. ¶¶ 8, 9; Bunngay Decl. ¶ 8f; Lipon Decl. ¶¶ 6b, 6c; Bennett Decl. ¶¶ 6, 7. Ex. E - Pl.'s Depo. - 29:21-30:4.)

/////

1    Plaintiff denies these facts to be true, but failed to provide any evidence in

2 support.   Plaintiff confirms he refused to voluntarily accept the injection.

3    23.  Dr. Soares, after discussion with the Team, initiated an order for emergency

4 medication I/M by injection at approximately 0945.  She signed the order for involuntary

5 emergency medication for Haldol, a standard anti-psychotic drug similar to Seroquel to treat

6 plaintiff's serious mental illness and mental disorders, for no more than 72 hours.  (Soares' Decl.

7 ¶ 18; Bunngay Decl. ¶ ; Lopez Decl. ¶  8; Ex. A - Medical Files - Phys. Progress Note (at 75);

8 Phys. Order (at 106); Ex. C - Medication & Treatment Chart (at 31).

9    Plaintiff denies these facts to be true, but failed to provide any evidence to the

10 contrary.

11    23a.  Defendants contend that after the emergency injection, plaintiff became

12 calmer.  RN Bunngay encouraged plaintiff to take his ordered medications and plaintiff indicated

13 he would.  (Bunngay Decl. ¶ 8k; Ex. A - Medical Files - 2/14/07 Bunngay entry on IND @ 1345:

14 Encouraged to take ordered medication and said "okay." )

15    Plaintiff denies these facts to be true, but failed to provide any evidence to the

16 contrary.

17    24.  On February 14, 2007, Senior MTA Bennett was called by RN Bunngay to

18 assist with plaintiff's cell extraction and the administration of involuntary emergency medication

19 I/M by injection as ordered by Dr. Soares.

20    25.  MTAs in VPP's Q-3 unit and MTAs Terry, Holloway and Rayfield from

21 other units also responded.

22    26.  Senior MTA Bennett informed plaintiff that he was there for a cell extraction

23 so they could administer the emergency medications I/M as ordered by Dr. Soares, and spent a

24 considerable amount of time to encourage plaintiff to "cooperate with administration of the

25 emergency medication for his own good and to cuff up" voluntarily for the medication.

26 /////

1    27.  Plaintiff is a big man, approximately 6'2" and weighs between 220-235

2  pounds.

3    28.  Plaintiff "cuffed up" voluntarily because he wanted to talk with Dr. Soares

4  about taking his emergency medication orally and was brought out to the Day Room where Dr.

5  Soares and the Treatment Team were waiting.

6    29.  While meeting with Dr. Soares about his suicide risk and medication, plaintiff

7  became increasingly argumentative, agitated and angry at Dr. Soares as she was trying to explain

8  why he needed to take the emergency medication I/M by injection.

9    30.  Plaintiff threatened to resist the administration of the emergency medication

10  and said to everyone in the Day Room that "it was not going to be easy."  Plaintiff made an

11  unexpected movement potentially putting Dr. Soares at risk because she was sitting across from

12  plaintiff.  Plaintiff physically resisted the MTAs' attempt to administer the medication by

13  grabbing the back of his chair and wrapping his legs around them.[3]

14    Plaintiff states that when he knew he was going to be forcibly medicated, he

15    grabbed the back of the chair in an attempt to resist the injection.
     The chair was kicked out from underneath [him], and [he] was
16    slammed on the ground, landing on the right side of [his] face and
     right shoulder.  This take down was conducted under the direct
17    supervision of defendant Bennett, by defendants Terry, Holloway,
     and Rayfield.

18

19  (Pl.'s Decl. at 3.)

20    31.  Senior MTA Bennett supervised the MTAs to restrain plaintiff from moving

21  forward and to do a "take down" so that MTA Gooselaw could administer the involuntary

22  emergency medication by injection as Dr. Soares had ordered.

23  /////

24

25    [3] Plaintiff admits to undisputed fact number 30, and states he will stipulate that the
    grabbing of the back of the chair was the "unexpected movement" referred to in number 30.  (Id.
26  at 2.)

32. MTAs Terry, Holloway or Rayfield participated in the "take down" for the administration of the involuntary emergency medication by injection, and held plaintiff down on the floor while MTA Gooselaw gave plaintiff the injection pursuant to Dr. Soares' order.

33. Defendants contend no unnecessary force was used for the "take down." Defendants declare no one "slammed" plaintiff to the ground or kicked the chair out from under plaintiff. (Bennett Decl. at ¶ 7; Lopez Decl. at ¶ 9.)

Plaintiff contends that because he agreed to take the medication orally, any force used was excessive. Plaintiff also claims defendants "slammed" him to the ground.

34. Defendants state neither plaintiff nor any of the MTAs suffered any injury or harm from the "take down." (Bennett Decl. at ¶ 7; Lopez Decl. at ¶ 9 & Ex. 2; Bunngay Decl. ¶ 8j - Ex. A - 2/14/07 IND@1300 (at 141). Ex. E - Pl.'s Depo. at 19:24-20:8.)

Plaintiff disputes these facts and claims no one asked him if he suffered any injuries. However, plaintiff has failed to identify any injuries or provide any evidence suggesting he sustained any injuries.

34a. Plaintiff was laughing and joking with defendants while they were restraining him. (Ex. E - Pl.'s Depo. at 19:24-20:8.)

35. Defendants contend Dr. Soares and the Treatment Team exercised their medical judgment to place plaintiff in five-point leather restraints based on a decision that plaintiff was both a danger to himself and to others based on (a) plaintiff's suicidal/self-injurious behavior on February 13, 2007; (b) his demonstrated unpredictability and agitation, aggression and anger at Dr. Soares when he didn't get his way; (c) physical resistance to the MTAs' administration of the emergency medication; (d) past history of anger/rage and banging his head against the cell door and walls. (Soares' Decl. ¶¶ 22, 23, 24; Lopez Decl. ¶ 10; Bunngay Decl. ¶¶ 8i, 8j. Ex. E. - Pl.'s Depo. at 20:9-14.)

/////
/////

1    Plaintiff disputes these facts.  Plaintiff contends the five-point restraints were

2   unjustified because he did not exhibit any behavior which entailed a danger to himself or others.

3   (Pl.'s Decl. at 3.)

4    35a.  Defendants contend the Team determined five-point restraints for no more

5   than four hours was medically necessary and appropriate to prevent serious imminent harm to

6   plaintiff from further injury to himself or others, or self-inflicted harm by tearing at his current

7   wound site, or banging his head against the cell wall or door, and to protect staff, who would

8   have to interact in the care and treatment of plaintiff while the medication took effect, and

9   because of plaintiff's escalating agitation, anger and combativeness.  (Soares' Decl. ¶¶ 22, 23,

10  24; Lopez Decl. ¶ 10; Lipon Decl. ¶ 8.  Ex. E. - Pl.'s Depo. at 21:12-14; 22:3-6.)

11    Plaintiff disputes these facts.  Plaintiff contends the five-point restraints were

12  unjustified because he did not exhibit any behavior which posed a danger to himself or others.

13  (Pl.'s Decl. at 3.)

14    35b.  Dr. Soares and SRN Lopez completed their parts on the Physician's Order

15  regarding the five-point restraints indicating alternatives used prior to restraints and a Special

16  Incident Report and Review.

17    36.  Defendants maintain plaintiff was released from his five-point restraints after

18  three hours when he met the release criteria of being calm and cooperative.  Plaintiff suffered no

19  injuries from either the emergency medication or the five-point leather restraints.  Bunngay Decl.

20  ¶ 8j (Ex. A-IDN at 143), 8k, 8l (Ex. A - IDN, at 142), 8n (Ex. A - lDD (at 143, 156, 157).  Ex. B

21  - Observation Records at 6-28.)

22    Plaintiff denies these facts to be true.  Plaintiff claims he was held in five-point

23  restraints for four hours.  (Pl.'s Depo. at 21.)  Plaintiff has provided no evidence of injuries.

24    37.  Dr. Soares' actions and medical decisions were within the community

25  standards and practices of psychiatric medicine.  (Lipon Decl. ¶ 9; Soares' Decl. ¶¶ 22, 23, 24;

26  Lopez Decl. ¶ 10.)

Plaintiff denies these facts are true, but fails to provide an expert opinion to the contrary.

38. Plaintiff submitted a Fee Waiver Application and did not pay a required $25 filing fee with the submission of his state government tort claim to the California Victim Compensation & Government Claims Board (Board of Control).

39. Defendants maintain there is no record plaintiff filed a certified copy of his Trust Fund Account information to the Board of Control as required for his Fee Waiver Request to be granted. There is no record of any application for a late claim filed with the Board of Control. The Board of Control has not rejected any timely claim filed by plaintiff. (Gee Decl. at Ex. F - Certified Records For Stoltie Claim #G568998 at 1-6.)

Plaintiff contends that he submitted all completed documents to the Robert Presley Detention Center's Business Office for further processing, including the attachment of a certified copy of plaintiff's trust fund account statement.

II. Plaintiff's Claims

Plaintiff argues that defendants substantially interfered with his liberty in avoiding unwanted anti-psychotic drugs and by placing him in five-point restraints, and used excessive force while administering the injection.[4] (Pl.'s Decl. at 1.) The court will address these claims seriatim.

Plaintiff contends that he was not a threat to himself or others at the time he was forcefully medicated and points out he offered to take oral medication, obviating the need to use force.

Defendants contend that plaintiff's substantive due process liberty interest under the Fourteenth Amendment to be free from unwanted drugs fails because the state is entitled to

_____

[4] Plaintiff did not allege a procedural due process violation or claim that defendants were deliberately indifferent to his serious medical needs. (Complt., passim; Opp'n, passim.) Thus, the court need not address those claims.

14

treat a seriously mentally ill inmate with anti-psychotic drugs without consent if it was medically determined by a licensed psychiatrist that the inmate is a danger to himself or others and the treatment is in the inmate's medical interests.  Washington v. Harper, 494 U.S. 210, 222 (1990).

Defendants have also provided the expert opinion of Richard Lipon, M.D., Medical Director at the Department of Mental Health's Vacaville Psychiatric Program (VPP) at California Medical Facility.  (Lipon Decl. at 1.)  Dr. Lipon is Board certified in Psychiatry and Neurology and is presently Dr. Soares' supervisor.  Dr. Lipon reviewed plaintiff's medical records and files and found Dr. Soares and the Treatment Team were confronted with the following emergency circumstances on February 14, 2007:

1.  Plaintiff intentionally cut himself on February 13, 2007 and sustained significant blood loss, requiring emergency treatment at the B1 Clinic.  As a result, plaintiff was place on suicide watch by the attending psychiatrist.

2.  On February 14, 2007, plaintiff was still "acting differently, if not bizarrely, refusing his morning oral medications on two different occasions, which included his anti-psychotic drug he had previously requested and consented to take for his self injurious behavior and his anger and rages."  (Id. at 3.)  Plaintiff refused to meet with his Treatment Team or talk to Dr. Soares, and buried himself underneath his blanket in his cell.  Because plaintiff had been fairly compliant since January, 2007, this behavior was "not usual and unexpected."  (Id. at 4.)

3.  Plaintiff's self-injurious behavior on February 13, his refusal to take his morning medications on February 14 and his previously-agreed oral medications several days before, and his refusal to meet with the Treatment Team or Dr. Soares, "demonstrates [plaintiff's] impaired mental state and judgment and his inability to weigh the risks and benefits of his treatment options on February 14, 2007."  (Id. at 4.)

4.  Plaintiff was previously assessed to be a high suicide risk based on his long history of suicidal/self-mutilatory behaviors when untreated with anti-psychotic medication, and which, but for emergency medical services, would have been fatal.  (Id.)  The cutting on February

13, 2007 was made in the same arm and the same area where plaintiff had previously cut in 2006, which supported Dr. Soares' concern that plaintiff "had a historical pattern of progressive escalation of his self-injurious behavior if left untreated." (Id.)

Dr. Lipon opined as follows:

1. The decision by Dr. Soares and the Treatment Team to administer an emergency involuntary medication by injection was well within the professional standards of psychiatry practice and medicine based on the emergency circumstances, plaintiff's serious mental illness, past history of mutilations and unpredictable anger and rages. Haldol was an appropriate medication and administering it intramuscularly by injection was "medically necessary and appropriate given the emergency situation: it assures compliance and gets into the body quicker and acts faster than medication taken orally." (Id. at 4-5.)

2. It was appropriate for defendants to place plaintiff in five-point leather restraints "because he had demonstrated that he had become unpredictable and escalated his agitation, anger and aggression at not getting his way about taking his emergency medication orally, which quickly turned into actual physical resistance and struggle with the MTAs as they tried to administer the emergency medications." (Id. at 5.) Plaintiff's history of self-injurious mutilations and disproportionate and unpredictable anger/rage episodes when he doesn't get his way, which stems from his diagnosed mental illness, create an extremely high suicide and safety risk for himself and a high assault risk and danger to those staff who have to care and treat him. (Id.) "Because his episodes of escalating self-harm and rages have also included banging on his cell walls and doors, he was protected from doing so with the restraints until it was clear he was responding appropriately to the involuntary medications he was given." (Id.)

3. Plaintiff presented a danger to himself requiring immediate intervention. Dr. Soares' actions and medical decisions and the remaining defendants' efforts to carry out those decisions on February 14, 2007 were "well within the community standards and practices of psychiatric medicine." (Id.)

A prison inmate possesses a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment.  Washington v. Harper, 494 U.S. 210, 222, 110 S.Ct. 1028 (1990).  Given the requirements of the prison environment, however, the state may treat an inmate who has a serious mental illness with anti-psychotic drugs against his will if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.  Id. at 227.

The following facts are undisputed:  plaintiff suffers from a serious mental illness and on February 13, 2007, plaintiff attempted to hurt himself, ripping open a vein with a staple, resulting in significant blood loss.  This was a sudden change from his previous behavior and mental state as he had not engaged in any intentional cutting of himself since he was admitted on January 1, 2007.  Plaintiff had a history of attempted suicide, at least two prior cutting incidents, and a family history of suicide.  Plaintiff refused to take his medications on the morning of February 14, 2007.  (Defts.' Ex. B at 29; Pl.'s Decl. at 3.)  Medical records confirm that plaintiff also refused to take medications eight different times between February 3, 2007 and February 13, 2007.  (Defts.' Ex. B at 29.)  Plaintiff concedes he resisted the administration of the injection.

Defendants have provided evidence that Dr. Soares, a licensed psychiatrist, determined plaintiff to be a danger to himself.  Plaintiff declares that he doesn't "believe an emergency existed" (pl.'s Decl. at 3), because he "did not exhibit any behavior which entailed a danger to [him]self or others."  (Id.)

However, Dr. Lipon reviewed plaintiff's medical files and records and concluded that:

> Given all of the . . . emergency circumstances confronting Dr. Soares and the Treatment Team on February 14, 2007, [plaintiff] was clearly a serious danger to himself requiring immediate intervention to prevent [plaintiff] from further escalating and seriously harming himself or others.  Dr. Soares' actions and medical decisions along with the MTA defendants' efforts to carry out those medication decisions of February 14, 2007, in protecting this very dangerous inmate/patient is well within the community standards and practices of psychiatric medicine.

Id. at 5.

Plaintiff's statement under penalty of perjury is insufficient to rebut the psychiatrist's medical findings that plaintiff was a danger to himself based on plaintiff's self-injurious behavior on February 13, 2007, his prior acts of self-injurious behavior, his family history of suicide, his refusal to take his medications for the prior 8 days, his refusal to take his oral medications on the morning of February 14, 2007, and his refusal to respond or meet with the Treatment Team for evaluation of his suicide risk and need for additional treatment. Moreover, Dr. Soares believed the injection was appropriate because oral medication, whether in tablet or liquid form, would take too long to take effect. Plaintiff has not rebutted Dr. Soares' medical conclusions or Dr. Lipon's expert opinion with probative evidence or expert opinion. Inasmuch as Dr. Soares' treatment was justified, the actions of the remaining defendants in carrying out her orders were also justified. Defendants are entitled to summary judgment on plaintiff's substantive due process claim.

Plaintiff's claim that he was deprived of his liberty by being placed in five-point restraints fails for the same reason. Defendants have provided an expert opinion that plaintiff was restrained for his own safety, to keep him from ripping out the stitches from his arm, from banging on cells walls or doors, or from injuring his care providers. Plaintiff has provided no evidence to the contrary. Defendants are entitled to summary judgment on this claim as well.

Finally, plaintiff contends that all force used by defendants was excessive once he agreed to take the medication orally (Pl.'s Stmt. at 2), and that defendants kicked the chair out from under him and "slammed" him to the ground. (Pl.'s Decl. at 3; Complt. at 5.)

Defendants argue that plaintiff's self-serving declaration is insufficient to prove defendant MTAs acted with malicious and sadistic intent to harm plaintiff under Hudson v. McMillian, 503 U.S. 1, 6 (1992).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." <u>Id.</u> (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." <u>Id.</u>

"The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." <u>Id.</u> (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. <u>Id.</u> at 9; see also <u>Oliver v. Keller</u>, 289 F.3d 623, 628 (9th Cir.2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." <u>Id.</u> at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Id.</u> at 9-10 (internal quotations marks and citations omitted).

Here, it is undisputed that plaintiff resisted the administration of the injection. Plaintiff concedes he stated "he would resist and fight the forced drugging." (Pl.'s Stmt. at 2.) Because of this resistance, MTA defendants were required to use some force to administer the injection ordered by Dr. Soares. Although plaintiff was forced to the ground by a take-down, it does not appear any of the defendants used more force than was necessary under the circumstances. The record demonstrates there was a reasonably perceived threat; plaintiff is a big man, has a history of anger/rage issues, and assaultive behavior. Plaintiff has provided no evidence to suggest the force was not applied in good faith. Indeed, the record demonstrates that defendant Soares attempted to persuade plaintiff to take the injection voluntarily, and defendant

Bennett attempted to temper the need for force by encouraging plaintiff to cooperate in receiving the injection. (Bennett Decl.)

Plaintiff concedes he was laughing and joking with defendants while they were restraining him. (Ex. E - Pl.'s Depo. at 19:24-20:8.) Plaintiff has provided no evidence suggesting he was injured and also described the actions of MTA defendants as a "take-down." (Pl.'s Decl. at 3.) Plaintiff has provided no evidence to suggest any of these defendants acted with malice or had a sadistic intent to harm plaintiff. Rather, the force was used to enable defendant Gooselaw to administer the injection.

In light of this record, plaintiff's bald assertion that he was "slammed" to the ground is insufficient, without more, to create a genuine dispute of material fact that MTA defendants used excessive force under Hudson.

Accordingly, defendants are entitled to summary judgment on this claim as well.

d. State Law Claims

Plaintiff seeks money damages under state law and declares a claim was presented to and rejected by the State Board of Control. (Amended Complt. at 5.)

Defendants argue that plaintiff's state law claims should be dismissed for failure to file a timely government claim pursuant to the California Tort Claims Act ("CTCA"), Cal. Gov't. Code § 900 et seq. Defendants confirm that on July 25, 2007, plaintiff submitted a Government Claims form to the Board. (Defts.' Ex. F at 4.) Defendants also provide evidence that the Board did not receive plaintiff's certified copy of his trust fund account; the Board wrote to plaintiff on July 27, 2007, informing him his claim was incomplete. (Id. at 3.) Moreover, plaintiff was informed that

> in order for tort claims to be considered complete, the above-referenced questions must be answered in writing within six months of the original date of incident [citations omitted].

Id.

/////

20

The CTCA requires that a tort claim against a public entity or its employees be presented to the California Victim Compensation and Government Claims Board, formerly known as the State Board of Control, no more than six months after the cause of action accrues. See Cal. Gov't. Code §§ 905.2, 910, 911.2, 945.4, 950-950.2. Presentation of a written claim, and action on or rejection of the claim, are conditions precedent to suit. Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir.1995).

Section 911.2(b) of the California Government Code states:

(b) For purposes of determining whether a claim was commenced within the period provided by law, the date the claim was presented to the California Victim Compensation and Government Claims Board is one of the following:

(1) The date the claim is submitted with a twenty-five dollar ($25) filing fee.

(2) If a fee waiver is granted, the date the claim was submitted with the affidavit requesting the fee waiver.

(3) If a fee waiver is denied, the date the claim was submitted with the affidavit requesting the fee waiver, provided the filing fee is paid to the board within 10 calendar days of the mailing of the notice of the denial of the fee waiver.

Cal. Govt. Code § 911.2(b). Section 905.2(c) requires state prisoners to provide a certified copy of the statement of the inmate trust account. Cal. Govt. Code § 905.2(c) ("shall be submitted.") Section 905.2(d) provides:

(d) The time for the board to determine the sufficiency, timeliness, or any other aspect of the claim shall begin when any of the following occur:

(1) The claim is submitted with the filing fee.

(2) The fee waiver is granted.

(3) The filing fee is paid to the board upon the board's denial of the fee waiver request, so long as payment is received within 10 calendar days of the mailing of the notice of the denial.

Cal. Govt. Code § 905.2(d).

/////

1        Defendants have provided evidence that demonstrates plaintiff failed to pay the

2  $25 fee or to submit the certified trust account statement. (Defts.' Ex. F.) Defendants have also

3  provided evidence that the Board has not granted or denied plaintiff's fee waiver. (Id.)

4        Plaintiff contends he submitted all of the paperwork, including the certified trust

5  account statement, to prison officials for processing to the Board. However, he fails to provide

6  any evidence in support, such as a copy of the paperwork submitted, or a copy of a letter

7  objecting to the Board's claim that he failed to submit one. There is nothing in the record to

8  suggest plaintiff did not receive the letter, which was addressed to the address plaintiff provided

9  in his claim form submitted to the Board.

10        Plaintiff has failed to timely complete his claim under the California Government

11  Claims Act and there is no evidence plaintiff has filed a late claim. Therefore, defendants are

12  also entitled to summary judgment on plaintiff's state tort law claim.

13        In accordance with the above, IT IS HEREBY RECOMMENDED that summary

14  judgment be granted.

15        These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties. Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

20  failure to file objections within the specified time may waive the right to appeal the District

21  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: May 26, 2009.

23

24                      UNITED STATES MAGISTRATE JUDGE

25

26  001; stol1479.msj